# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DAVID PAGE,                          :
                                     :
                 Petitioner,         :          Civ. No. 11-2558 (KM)
                                     :
        v.                           :          **OPINION**
                                     :
GREG BARTKOWSKI, et al.,             :
                                     :
                 Respondents.        :

**KEVIN MCNULTY, U.S.D.J.**

## I.    INTRODUCTION

Petitioner, David Page, is a state prisoner currently incarcerated at the New Jersey State Prison in Trenton, New Jersey. He is proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 2004, Mr. Page was convicted by a jury of several counts of robbery and unlawful possession of a weapon. He is currently serving a fifty-year sentence on these convictions with an eighty-five percent parole ineligibility. Mr. Page raises claims that roughly fall into four categories: (1) violation of his Confrontation Clause rights; (2) prosecutorial misconduct; (3) ineffective assistance of counsel; and (4) unconstitutional sentence. For the following reasons, the habeas petition will be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

> On August 10, 2002, at approximately 1:30 a.m., Clyde Martin was sitting on a porch on Bayview Avenue in Jersey City with Alfonso Newsome, Cory McGowan and Ed McKinney, when two men, one of whom was later identified by Martin as defendant, approached them holding guns. Defendant shoved a silver and black gun into Martin's chest and said, "you know what this is, empty your pockets." Martin noticed that defendant was wearing

---

[1] The factual background is taken from the decision, dated March 20, 2007, of the New Jersey Superior Court, Appellate Division on Mr. Page's direct appeal. (*See* Dkt. No. 9-16.)

beige work gloves with black grips on the hands. Martin saw that after defendant and the other man had robbed him and McGowan, they went across the street and proceeded to rob Africa Barbour and Newsome.

Barbour was sitting in her car with a female outside 33 Bayview Avenue. Barbour was talking to Newsome, who was standing outside the car. Barbour looked to her left and from fifteen feet away, saw defendant and another man "sticking up" three men across the street. Barbour heard the robbers say to the men, "you know what this is," "get down" and "don't move." She also heard the robbers say, "give me what you got in your pockets. Give me everything."

Barbour proceeded to put her key in the ignition to leave; however, as she looked back out the window, defendant was standing there pointing a silver gun in her face. Barbour saw that defendant was wearing white work gloves with "bubbles" on them, commonly used in construction. Defendant told Barbour not to move and to give him the keys, while the other perpetrator opened the passenger side door, grabbed Barbour's friend out of the car, snatched and shook the friend's bag. Defendant continued to hold the gun to Barbour's face and repeatedly commanded, "don't move." Defendant then took Barbour's keys. Barbour saw either defendant or the other man go through Newsome's pockets and take his wallet. Then, defendant and the other assailant fled down the block and jumped into a car, which drove off.

Officers Thomas Donnelly and Victor Smith, of the Jersey City Police Department, were on patrol at 1:45 a.m. when they received a dispatch of an armed robbery in the area of 33 Bayview Avenue. When Donnelly arrived on the scene about fifteen minutes later, he spoke with McGowan and Martin, who reported that they had been robbed at gunpoint. They gave the officers a description of the perpetrators. The police then spoke to Barbour and Newsome across the street, and obtained a similar description from them.

All of the victims indicated that there were two individuals involved in the armed robbery. According to Donnelly, the victims described defendant as a dark-skinned black male with a medium build, short hair and a goatee, approximately 5 feet, 9 inches tall, wearing a gray T-Shirt, dark jeans, beige work gloves, and holding a large silver semi-automatic handgun.

McGowan reported that the robbers took a silver bracelet and his wallet containing his personal identification and eighty dollars.

2

Martin indicated that his silver watch, wallet and cellular phone were taken during the robbery. Newsome told Donnelly that the robbers stole sixteen dollars from him. Barbour reported that her keys were taken from her car during the robbery.

A short time later, David Melvin and Eric Perez were standing at the intersection of Bergen and Harrison Avenues, when a man suddenly came at Melvin from the left and another man approached Melvin from the right. One of the men, later identified as defendant, pointed a silver gun at Melvin's face and stated, "you know what time it is, get down on the ground." Melvin noticed that the gun's hammer was cocked. Melvin clearly observed defendant and noticed that he had close-cropped hair and was wearing a mask that partially covered his mouth. Melvin also saw that defendant was wearing black and green gloves. Defendant hit Melvin on the back of the ear with the gun and ordered him to lie down.

Meanwhile, Officers Michael Kenny and James Keating were on patrol, traveling westbound on Communipaw Avenue, when a man flagged them down at the corner of Communipaw and Bergen Avenues and told them that two men with guns were robbing someone "around the corner." Acting on this information, the officers proceeded in their patrol car to the area of Bergen and Harrison Avenues. As they turned the corner onto Bergen Avenue, Kenny looked to his right and observed fifteen to twenty feet away Melvin and Perez lying on the ground with defendant standing over them holding an unidentified object in his right hand and pointing it at the victims at a forty-five degree angle.

Defendant looked up at Kenny and then ran eastbound on Harrison Avenue and then south through a vacant lot towards Communipaw Avenue. Kenny approached Melvin and Perez who were still lying on the ground; as they got to their feet, they told Kenny that they had just been robbed at gunpoint by the individual who had fled down Harrison Avenue and another man. Each separately described defendant as a dark-skinned black male with a mustache, approximately five feet, ten inches tall, and approximately 200 pounds. Melvin observed that defendant was wearing a long, white T-shirt. Kenny broadcasted a description of defendant and the direction he fled over the police radio.

Detective Kevin Caldwell arrived at the robbery scene and spoke with Melvin and Perez. Melvin reported that defendant had taken his gold wedding band, silver watch, a blue Sprint cellular phone, $300 and keys to a Chevy Malibu. Perez stated that his red

3

Yankees jersey, red Yankees baseball cap and thirty-five dollars were taken during the robbery.

At approximately 2:00 a.m., Officers Steven Antman and Vince Glenn were on patrol on Communipaw Avenue, when they received a call relating the armed robbery in the area of Bergen, Communipaw and Harrison Avenues. The officers arrived in the area within seconds and began conducting a foot search for the robbery suspect.

At 625 Communipaw Avenue, Officer Antman saw a red Yankees jersey hanging over an eight to ten foot high fence with razor wire. Officer Antman looked through the fence into the secured used car lot and observed defendant hiding near a parked car. Caldwell arrived on the scene and also saw defendant hiding in a crouched position with his hands covering his face. Defendant was arrested and taken to the West District police precinct for processing.

When the police removed the Yankees jersey from the fence, they found the Yankees fitted baseball cap and a loaded silver automatic handgun concealed inside the fence's razor wire. At trial, Antman identified a photograph of the handgun as the one recovered from the fence. At trial, Melvin identified photographs of the jersey and the baseball cap as the items Perez had been wearing and that were taken by defendant during the robbery.

Later, the Emergency Services Unit opened the secured fence, and the police found on the ground, approximately five feet from where defendant had been hiding, a pair of white gloves, a five and ten dollar bill, a white metal watch and two folded sums of money. The police also found work gloves with small rubber dots on them near where defendant had been. Martin, Barbour and Melvin identified the gloves at trial as those defendant was wearing during the robberies.

Meanwhile, at the scene of the robberies on Bayview Avenue, after speaking with Melvin and Perez, Donnelly broadcasted the description of the robbers and the vehicle over the police radio. After the description was broadcasted, Detective Frascino directed the officers to come to the West District precinct because they had a suspect in custody, subsequently identified as defendant, who had been arrested in another robbery and fit that description.

At the West District precinct, Kenny obtained information from Melvin and Perez in the front lobby. At that time, two police officers brought defendant into the room. Kenny immediately

recognized defendant as the subject who fled the robbery scene and at trial identified defendant as the individual he saw at the intersection and at the police precinct that night. Kenny also stated that Melvin and Perez also identified defendant as the man who robbed him. Kenny testified:

> [OFFICER KENNY]:  Well, at that time, I was in the precinct with Mr. Melvin and Mr. Perez gathering information for the report. They were advising me what had been stolen and they provided me with information regarding their personal information, where they lived, date of birth, and telephone numbers where they could be contacted, and at that time, they had brought the Defendant into the precinct, and they both looked up and said that's the guy right there. That's the guy who robbed us.
> [PROSECUTOR]:  Was he in the company of other Officers at the time, if you know?
> [OFFICER KENNY]:  Yes, he was.
> [PROSECUTOR]:  Do you recall whether you said anything to them about [defendant] at all at the time he came in?
> [OFFICER KENNY]:  No, I did not.
> [PROSECUTOR]:  Do you recall at least in your presence whether anyone said anything to Mr. Melvin or Mr. Perez regarding anything about [defendant] upon his entering?
> [OFFICER KENNY]:  No, I believe the only thing that was said to Mr. Melvin and Mr. Perez was that the Detectives would have to speak to them at some point during the night.

Approximately fifteen to twenty minutes elapsed between the time Donnelly initially spoke to McGowan, Martin, Newsome and Barbour and the time they arrived at the police precinct. Barbour was standing with "other people" who had been robbed, when she observed that the police "just happened to bring [defendant in]" and recognized defendant as one of the robbers. Barbour also identified defendant as the robber at trial.

At the precinct, while Martin was giving a statement to Detective Frascino, the police commented that "they caught the guy" and were leading defendant into the room when Martin saw defendant and identified him as the robber. He also identified defendant at trial as the person who robbed him. He further identified the

weapon, both at the precinct and at trial, as the silver and black gun that defendant had pointed into his chest during the robbery. The police also recovered small papers from Mr. Martin's wallet, which were returned to him at the precinct. Donnelly was involved in processing defendant at the police precinct when McGowan identified the bracelet defendant was wearing as his own. After photographing the bracelet, Donnelly returned the bracelet to McGowen. [sic]

At the West District precinct, Detective Caldwell took statements from Melvin and Perez. Melvin identified the recovered watch as his property, which was photographed and returned to him. Perez identified the Yankee jersey, three ten dollar bills and a five dollar bill as his property, which were photographed and returned to him.

Defendant neither testified nor produced witnesses at trial. In summation, defense counsel argued that defendant had been misidentified and pointed to factual inconsistencies among the victim's statements. The jury convicted defendant of all charges.

(Dkt. No. 9-16 at pp. 3-12.)

Mr. Page appealed his conviction and sentence to the New Jersey Superior Court, Appellate Division. The Appellate Division generally affirmed the judgment and conviction, but remanded the matter for resentencing. The Superior Court, on remand, imposed the sentence Mr. Page is now serving. (*See* Dkt. Nos. 9-18 & 19.)  Ultimately, the New Jersey Supreme Court denied certification on November 20, 2007. (*See* Dkt. No. 9-22.)

Mr. Page filed a post-conviction relief ("PCR") petition on February 11, 2008 in the New Jersey Superior Court, Hudson County. The Superior Court denied the petition on July 2, 2008. The Appellate Division affirmed the denial on January 26, 2010. (*See* Dkt. No. 9-38.)  The New Jersey Supreme Court denied certification on May 7, 2010. (*See* Dkt. No. 11 at p. 7.)

On April 28, 2011, Mr. Page filed the current federal habeas petition in this Court.[2] Respondents filed an answer and petitioner filed a reply.

---

[2] Pursuant to the prisoner "mailbox rule," a petitioner's court filing is deemed filed on the date he delivered it to prison officials for mailing. *See Houston v. Lack*, 487 U.S. 266, 270-71 (1988). When a

### III.   HABEAS CORPUS LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state

court can only be granted for violations of the Constitution or laws or treaties of the United

States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414,

415 n. 1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Because Mr. Page filed this petition for writ of

habeas corpus after April 24, 1996, it is subject to the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*,

521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any

claim decided on the merits in state court proceedings unless the state court's adjudication of the

claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States; or (2)

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*,

538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law'

under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the

state court renders its decision." *Id.* (citations omitted). A federal habeas court making an

unreasonable application inquiry should ask whether the state court's application of clearly

---

court is unable to determine the exact date that a prisoner handed his petition to a prison official for
mailing, it will look to the signed and dated certification of the petition. *See Henderson v. Frank*, 155
F.3d 159, 163-64 (3d Cir 1998) (using date prisoner signed petition as date he handed it to prison officials
for mailing); *Maples v. Warren*, No. 12-0993, 2012 WL 1344828, at *1 n. 2 (D.N.J. Apr. 16, 2012)
("Often times, when the court is unable to determine the exact date that a petitioner handed his petition to
prison officials for mailing, it will look to the signed and dated certification of the petition."). In this case,
Mr. Page's habeas petition is dated April 28, 2011. Therefore, that is the date that I shall use for purposes
of determining when he filed his federal habeas petition.

established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, - U.S. -, 131 S. Ct. 1388, 1398 (2011). The petitioner carries the burden of proof and with respect to review under § 2254(d)(1) and that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). AEDPA deference is not excused when state courts issue summary rulings on claims; "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, - U.S. -, 131 S. Ct. 770, 784-85 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

# IV.   DISCUSSION

A. <u>Timeliness</u>

Respondent argues that Mr. Page's federal habeas petition is untimely. The statute of limitations for a § 2254 petition is set forth in 28 U.S.C. § 2244(d), which states in relevant part:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to a judgment of a State court. The limitation period shall run from
>     (A) The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (2) The time during which a properly filed application for State postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

The limitations period runs from the date that Mr. Page's state court judgment became "final." A judgment is deemed final at the conclusion of direct appellate review, or the expiration of the time for seeking such review, including the ninety-day period for filing a petition for writ of certiorari in the United States Supreme Court. *See Swartz v. Meyers*, 204 F.3d 417, 419 (3d Cir. 2000); *Morris v. Horn*, 187 F.3d 333, 337 n.1 (3d Cir. 1999) (noting that state supreme court's decision became final after ninety days because the time for seeking certiorari expired).

The statute of limitations is statutorily tolled during the time in which a properly filed state PCR petition is pending. *See* 28 U.S.C. § 2244(d)(2). A prisoner's application for state collateral review is "'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (emphasis omitted). Such applicable laws and rules include "time limits, no matter their form." *Pace v. DiGiugulielmo*, 544 U.S. 408, 417 (2005). Thus, if a state court determines that a PCR application is untimely, then it will not statutorily toll AEDPA's limitation period, "regardless of whether [the state court] also addressed the merits of the claim, or whether its timeliness ruling was

entangled with the merits." *Carey v. Saffold*, 536 U.S. 214, 226 (2002). However, "if a state court fails to rule clearly on the timeliness of an application, a federal court 'must . . . determine what the state courts would have held in respect to timeliness.'" *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 85-86 (3d Cir. 2013) (quoting *Evans v. Chavis*, 546 U.S. 189, 198 (2006)).

In this case, the state court judgment became final on February 18, 2008, ninety days after the New Jersey Supreme Court denied certification on direct appeal. Accordingly, unless the statute of limitations was tolled, it expired a year later, on February 18, 2009.

Mr. Page filed his PCR petition on February 11, 2008, or before the end of his ninety-day period to seek certiorari with the United States Supreme Court. The New Jersey Supreme Court denied certification on his PCR petition on May 7, 2010.[3] Petitioner's one year AEDPA statute of limitations was therefore statutorily tolled—indeed, it did not even *begin* to run—until that date. Petitioner thus had one year, *i.e.,* until May 7, 2011, to file his federal habeas petition. Petitioner filed his federal habeas petition within that one-year time period, on April 28, 2011. The habeas petition is therefore timely.

B.  Claim I – Confrontation Clause and Related Objections

Mr. Page claims that his Confrontation Clause rights were violated when the trial court permitted police officers to testify to the out-of-court statements of witnesses and victims who did not testify at trial. (Relatedly, he claims that the witnesses' unavailability was not adequately established.) Additionally, he argues that the trial court improperly admitted certain physical

---

[3] Respondents incorrectly assert that the New Jersey Supreme Court denied certification on Mr. Page's PCR petition on March 16, 2010. That order did not dispose of the petition for certification, but only granted Mr. Page's motion for leave to file a notice of petition for certification and petition for certification. (*See* Dkt. No. 9-41.)  The New Jersey Supreme Court did not deny certification until May 7, 2010. (*See* Dkt. No. 11 at p. 7.)

evidence and improperly shifted the burden of summoning certain witnesses to defense counsel. Each of these arguments is considered in turn.

i.      *Confrontation Clause*

Mr. Page argues that his Confrontation Clause rights were violated when out-of-court statements by witnesses were admitted at trial. The last reasoned decision on this claim was from the Appellate Division on direct appeal. The Appellate Division described the testimony at issue as follows:

> [D]efendant argues that Officer Donnelly's testimony as to the description of defendant given by the victims of the first two robberies violated his Sixth Amendment right to confront witnesses against him because two of those victims, McGowan and Newsome, did not testify at trial.
>
> Donnelly, when asked by the prosecutor on direct examination whether the victims had provided him with descriptions of the suspects, replied as follows:
>
>> Victim number one described actor number one as being a dark-skinned black male, approximately five foot nine inches tall, with medium build, short hair and a goatee, last seen wearing a gray T-shirt, dark jeans, beige work gloves, and the actor was holding a large silver semiautomatic handgun.
>>
>> Q:  Do you recall that description being provided by each of the individuals you spoke with:
>> A:  Yes.
>
> Donnelly identified McGowen [sic] as "victim number one."

The Appellate Division then cogently analyzed the Confrontation Clause issue, citing appropriate case law. It correctly determined that the issue was whether the statements of McGowan and Newsome were "testimonial" in nature for purposes of the Confrontation Clause. That issue, in turn, may depend on whether the statements were made in response to an investigative interrogation, or were made to help the police deal with an ongoing emergency:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of

> the interrogation is to enable police assistance to
> meet an ongoing emergency. They are testimonial
> when the circumstances objectively indicate that
> there is no such ongoing emergency, and that the
> primary purpose of the interrogation is to establish
> or prove past events potentially relevant to the later
> criminal prosecution.

*Davis v. Washington,* 547 U.S. 813, 822 (2006). *See also Crawford v. Washington,* 541 U.S. 36,
68-69 (2004).

The Appellate Division decided that issue in Mr. Page's favor. The statements of
McGowan and Newsome, it held, were indeed testimonial in nature:

> At the time McGowan and Newsome gave their descriptions to
> Donnelly, the robberies of which they had been victims were over,
> and their assailants had fled the scene. There was no ongoing
> emergency. Thus, the descriptions of their assailants given to the
> police by McGowan and Newsome were testimonial statements
> and were inadmissible in light of the failure of those witnesses to
> appear at trial and be cross-examined.

The Appellate Division further determined, however, that any constitutional error was
harmless:

> Notwithstanding their inadmissibility, however, we are convinced
> that the admission of the non-testifying victims' statements was
> harmless beyond a reasonable doubt and was not "clearly capable
> of producing an unjust result." R. 2:10-2; *State v. Cotto,* 182 N.J.
> 316, 331 (2005).
>
> An error will be found to be "harmless" unless there is a
> reasonable doubt that the error contributed to the verdict. This is
> true even if the error is of constitutional dimension. *State v.
> Macon,* 57 N.J. 325, 338 (1971). The standard for determining
> whether constitutional error warrants reversal requires the State to
> convince the appellate court "beyond a reasonable doubt that the
> error complained of did not contribute to the verdict obtained."
> *Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L.
> Ed. 2d 705, 710 (1967); *State v. Scherzer,* 301 N.J. Super. 363, 441
> (App. Div. 1997).
>
> The two other victims, Martin and Barbour, both testified at trial
> and provided the same description of Donnelly as the non-
> testifying victims. Kenny actually observed defendant committing
> the second robbery and identified defendant both at the precinct on

12

the night of the robberies and in court. In addition, defendant was
caught with the proceeds from the robberies. Further, Martin,
Melvin, and Barbour identified defendant, the gun used in the
robberies, and the gloves defendant was wearing during the
robberies. Martin and Melvin also identified their property, which
was taken by defendant during the robberies. Thus, proof of
defendant's guilt was overwhelming. We are satisfied the
admission of this evidence did not lead the jury to a result it
otherwise might not have reached. *See State v. Bogus*, 223 N.J.
Super. 409, 429 (App. Div.), *certif. denied*, 111 N.J. 567 (1988);
*see also Hinton*, *supra*, 423 F.3d at 362.

(Dkt. No. 9-16 at p. 13-23.)

Mr. Page argues that the Appellate Division's opinion was an unreasonable application of

clearly established federal law. The Confrontation Clause of the Sixth Amendment states that,

"[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him." U.S. Const. amend. VI. "The Fourteenth Amendment renders the

Clause binding on the States." *Michigan v. Bryant*, - U.S. -, 131 S. Ct. 1143, 1152 (2011) (citing

*Pointer v. Texas*, 380 U.S. 400, 403 (1965)). And pursuant to the Confrontation Clause,

"[t]estimonial statements of witnesses absent from trial have been admitted only where the

declarant is unavailable, and only where the defendant has had a prior opportunity to cross-

examine." *Crawford v. Washington*, 541 US. 36, 59 (2004) (footnote omitted). "As to the

second requirement, the Confrontation Clause requires that a defendant have had 'a full and fair

opportunity to probe and expose [testimonial] infirmities' of an unavailable government witness

in order for that witness's prior testimony to be admissible." *Ross v. Dist. Attorney of Cnty. of*

*Allegheny*, 672 F.3d 198, 206-07 (3d Cir. 2012) (citing *United States v. Owens*, 484 U.S. 554,

558 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15 (1985))). The Confrontation Clause

applies to testimonial hearsay that is admitted to establish the truth of the matter asserted. *See*

*Crawford*, 541 U.S. at 59-60 n. 9 ("The [Confrontation] Clause also does not bar the use of

testimonial statements for purposes other than establishing the truth of the matter asserted.")
(citation omitted). "[S]tatements made under circumstances that would lead an objective witness
reasonably to believe that the statement would be available for use at a later trial are
testimonial." *United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005).

These principles, in themselves, give rise to no constitutional habeas challenge. Page
*prevailed* on these issues; the Appellate Division found that the statements were testimonial, and
that they were therefore erroneously admitted. Relatedly, Mr. Page asserts that the prosecution
failed to properly establish that these witnesses were unavailable. But this contention, too, only
goes to establish a Confrontation Clause violation, which for present purposes is conceded.

Mr. Page can only be disputing the Appellate Division's conclusion that any error was
harmless. Harmless error analysis applies to the admission of testimonial hearsay in violation of
the Confrontation Clause. *See United States v. Jimenez*, 513 F.3d 62, 78 (3d Cir. 2008) (citations
omitted). A habeas petitioner, to prevail, must establish that a constitutional error resulted in
"actual prejudice"—*i.e.,* that it had a "substantial and injurious effect or influence in determining
the jury's verdict." *Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir. 2013) (citing *Brecht v.
Abrahamson*, 507 U.S. 619, 637-38 (1993)). This Court does not, strictly speaking, sit in review
of the state court's harmless error analysis; it must perform its own. "[I]n § 2254 proceedings a
court must assess the prejudicial impact of constitutional error in a state-court criminal trial
under the 'substantial and injurious effect' standard set forth in *Brecht, supra,* whether or not the
state appellate court recognized the error and reviewed it for harmlessness under the 'harmless
beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*], 386 U.S. 18 [1967]."
*Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *see also Bond v. Beard*, 539 F.3d 256, 275-76 (3d
Cir. 2008) ("*Fry* instructs us to perform our own harmless error analysis under *Brecht* . . . rather

than review the state court's harmless error analysis under the AEDPA standard."). In reviewing the record, if a federal habeas court is in "grave doubt" as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict, then the error was not harmless. *See Adamson v. Cathel*, 633 F.3d 248, 260 (3d Cir. 2011) (citing *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995)).

I have no such "grave doubt" as to whether any Confrontation Clause error had a substantial and injurious effect or influence on the outcome of the trial. In determining whether an error is harmless, I look at the importance of the testimony to the government's case, the cumulative nature of the evidence, the existence of corroborating evidence, the extent of cross-examination allowed in the case and the strength of the government's case as a whole. *See Jimenez*, 513 F.3d at 78 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

This was a robbery spree, proven by interlocking testimony and evidence. Martin and Barbour, victims of the initial two robberies, testified at trial. When Martin was robbed, he was sitting on the porch with the two non-testifying declarants, McGowan and Newsome. Their perspective was exactly the same as Martin's, and it is not surprising that the description they gave the officer was similar to Martin's. Further, Martin saw Barbour robbed immediately thereafter. And Barbour, from across the street, saw and heard the events on the porch. Her testimony, too, paralleled the out-of-court statements of McGowan and Newsome, as well as the in-court testimony of Martin.

A police officer, Kenny, actually *witnessed* Page committing the subsequent robberies of Melvin and Perez. Kenny identified Page, both at the precinct on the night of the robberies and in court. Page was caught with the proceeds from the robberies. Further, Martin, Melvin, and Barbour identified the defendant, the gun used in the robberies, and the gloves defendant was

wearing during the robberies. Martin and Melvin separately identified items of property, taken in the robberies, that were recovered from Page's possession or nearby in his hiding place.

The case against Page was strong. The missing witnesses' testimony would have been cumulative at best. Any Confrontation Clause error did not have a substantial or injurious effect on the jury's verdict, and was harmless. Mr. Page is not entitled to federal habeas relief on this ground.

ii.    *Admission of Physical Evidence*

The State proffered as evidence photographs of the bracelet taken from McGowan, and of the jersey, cap and money taken from Perez. Mr. Page argues that the trial court erred in admitting this physical evidence, because it belonged to non-testifying witnesses. (Dkt 1-1 at pp. 9-10)

Respondent asserts that Mr. Page failed to exhaust this argument by raising it in his state court proceedings. That would be grounds in itself to deny the claim. This Court has the discretion, however, to consider and deny the claim on the merits if it is not colorable. *See Lucero v. Martinez*, 526 F. App'x 161, 164 n. 5 (3d Cir. 2013) (per curiam) (citing *Evans v. Ct. Com. Pl.*, 959 F.2d 1227, 1231 (3d Cir. 1992) ("[A] district court may deny a claim on its merits despite non-exhaustion if it is perfectly clear that the applicant does not raise even a colorable federal claim.")) (remaining citation omitted); *see also Lambert v. Blackwell*, 134 F.3d 506, 515-15 (3d Cir. 1997).[4]

An erroneous evidentiary ruling is not itself grounds for habeas relief. To rise to the level of a constitutional violation, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair, thereby violating a petitioner's due

---

[4]      I am also inclined to err on the side of considering the claim because it would likely be untimely under AEDPA if brought by any other means.

process rights. *See Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (noting that to show that an evidentiary error rises to the level of a due process violation, a petitioner must show "that it was of such magnitude as to undermine the fundamental fairness of the entire trial"). The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

There is no substantial showing that these challenges to the admission of physical evidence would succeed. Only a proper foundation is required; it is not a prerequisite that the item's owner testify. Still less would a ruling admitting such evidence, even if erroneous, rise to the level of a Constitutional deprivation. As to this claim, habeas relief is denied.

### iii.   *Shifting Burden to Produce Witnesses*

Mr. Page next argues that the trial court essentially shifted to him the burden of producing for trial the three victims who never testified, in violation of the Confrontation Clause.

It was the prosecutor who subpoenaed and primarily sought to compel the attendance and testimony of these three witnesses.[5] At trial, the prosecutor requested that the trial judge issue arrest warrants for the missing three victims. He stated on the record, however, that if they were not there by the next morning, the government would rest. The court agreed to issue the arrest warrants for the missing witnesses.

---

[5]      The Appellate Division described the situation thus:

> The prosecutor indicated to the trial judge, near the end of its case, that the State had been having difficulty reaching the three victims. The prosecutor advised the judge that the three non-testifying victims, McGowen, Newsome and Perez, had been subpoenaed, but that the subpoenas went unreturned. The prosecutor told the judge that as a result, the State did not have these witnesses available for trial. The prosecutor indicated to the judge that he would like to wait until the next day, and if the witnesses did not appear for trial, then the State would be prepared to rest. At the prosecutor's request, the trial judge issued warrants for the non-appearing witnesses to testify at trial. On the following day, the witnesses did not appear and the State did rest. (Dkt 9-17)

Mr. Page's trial counsel (Mr. Gualano), the prosecutor (Mr. Breland) and the Court then engaged in the following colloquy:

> MR. GUALANO:  What I would ask though, is that the Court consider, Mr. Page and I are requesting that come tomorrow morning, if those victims are not –
> THE COURT:  I am going to honor the Prosecutor's request which is what you said.
> MR. BRELAND:  I stand by that.
> THE COURT:  If they're not here, then we're proceeding with the trial.
> MR. GUALANO:  Thank you, Judge.

(Dkt. No. 9-57 at p. 16.)  It was in this exchange, says Mr. Page, that the Court violated his fair trial and Confrontation Clause rights by shifting the burden of producing these witnesses to the defense.

I cannot read this passage in the manner suggested by Page. The prosecutor sought the court's aid in compelling the attendance of three witnesses. Page's counsel made a request, which was cut off, that "come tomorrow morning, if those victims are not…" The Court, anticipating the request, assured defense counsel that if the witnesses were not there, they would be "proceeding with the trial"—*i.e.,* that the prosecutors would have to proceed without them. Defense counsel, Gualano, did not object or indicate that he had been misunderstood. He said "Thank you, Judge."[6] To hold the government to an overnight deadline was not a defeat, but a minor procedural victory for the defense; as it turned out, the prosecution had to do without these witnesses' testimony. This goes beyond default to waiver; the court did precisely what the defense asked it to do.  So the notion that this shifted to the defense the "burden" of calling these witnesses seems misconceived at the start.

---

[6]     Common sense suggests that the defense might have anticipated that these witnesses' testimony, sought by the prosecution, might harm the defense case. That is not essential to my point, however. Indeed, defense counsel made much of the witnesses' absence in his summation, telling the jury he had seen police reports and that their statements would have helped exculpate his client. 3T at 31.

Nor do I see any violation of clearly established federal law, as established by the Supreme Court of the United States, or an unreasonable applicable of federal law. *See* 28 U.S.C. § 2254(d)(1)). This is not "burden shifting" in the established sense of relieving the government of its burden of proof beyond a reasonable doubt. I suppose it could be said in some trivial sense that the government, every time it does not call a potential witness, "shifts" the burden of calling that witness to the defense, but the point has no constitutional resonance. Mr. Page cites *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). There, the Supreme Court held that evidence affidavits analyzing a seized substance as cocaine were "testimonial" for purposes of the Confrontation Clause. *See id.* at 329. That has little to do with Mr. Page's claim here.

Respondent argues that Mr. Page failed to exhaust this issue, and indeed it appears that he did not raise the precise issue of whose "burden" it was to produce these witnesses. That may be the case. But, as I say, there is no colorable claim here, and indeed any arguable claim was waived. On this ground, too, habeas relief will be denied.

C. Claim II – Prosecutorial Misconduct

Mr. Page raises two prosecutorial misconduct issues. First, he claims that the prosecutor committed misconduct by misrepresenting at trial that all six victims would testify. Second, Mr. Page argues that the prosecutor committed misconduct by eliciting from Detective Caldwell statements from Eric Perez, who never testified at trial. Mr. Page alleges that these actions compounded the Confrontation Clause violations.

   i.   *Misrepresenting That All Six Victims Would Testify*

Mr. Page first claims that the prosecutor committed misconduct by initially representing to the judge and to the defense that all six victims would testify at trial. That issue was last

discussed by the Appellate Division during Mr. Page's PCR proceedings. That court stated as follows:

> Defendant's attorney now contends that the motion judge erred by applying procedural bars because the issues raised on the direct appeal were not identical, or substantially equivalent, to those previously raised. On appeal, as did PCR counsel, defendant contends that the State's failure to produce all six victims at trial amounts to prosecutorial misconduct that prejudiced his right to a fair trial. No explanation is proffered by defendant as to why that particular argument, even if it had merit, could not have been raised on direct appeal.
>
> PCR counsel claimed, without any foundation, that the three witnesses who did not appear would not have identified defendant. This is indeed a bald assertion, insufficient to afford defendant any relief. *Cummings, supra,* 321 N.J. Super. at 170.

(Dkt. No. 9-38 at p. 9.)

Thus the claim was denied for two reasons: because Mr. Page failed to show why he did not raise it on direct appeal, and on the merits. As to the merits, AEDPA deference still applies. *See Rolan v. Coleman,* 680 F.3d 311, 321 (3d Cir. 2012).

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Wainwright,* 477 U.S. 168, 182-83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht,* 507 U.S. at 638. A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton,* 255 F.3d 95, 107 (3d Cir. 2001).

In this case, the prosecutor's initial representation that all six defendants would testify did not so infect the trial with unfairness as to deny Mr. Page due process. There is no indication of bad faith. Indeed, the record indicates that the prosecutor intended to have the three missing witnesses testify at trial, but was unable to locate them. The prosecutor attempted to obtain their appearance via an arrest warrant, but to no avail. And, as the Appellate Division pointed out, there is no evidence or information suggesting that the missing witnesses' testimony would have favored the defendant.

In any event, the evidence against Mr. Page was strong and the witnesses' testimony presumably would have been cumulative of that of the other victims who testified. Even if the prosecutor's actions had been improper, I could not find that they had a deleterious effect on the fairness of the trial. Accordingly, Mr. Page fails to show that he is entitled to federal habeas relief on this prosecutorial misconduct claim.

    ii.    *Eliciting Eric Perez's Statements from Detective Caldwell*

Mr. Page also argues that the prosecutor committed misconduct by eliciting from Detective Caldwell certain statements of Eric Perez, who did not testify at trial. Mr. Page did not exhaust this claim by raising it in the state courts, which is enough to require that it be denied. Nevertheless, I consider it and deny it on the merits because it fails to state a colorable claim. *See Lambert*, 134 F.3d at 514-15.

During redirect examination of Detective Caldwell, the prosecutor asked him about his report, which included Caldwell's question to Mr. Perez as to whether he got a good look at the robber. (*See* Dkt. No. 9-60 at p. 5.)  Caldwell testified that Mr. Perez described the individual with the weapon as being "[a]bout 180 pound, five foot eight to five foot nine inches tall, goatee, dark brown skin, he had a white shirt." (*Id.*)

21

As established above, the statements of non-testifying witnesses did not have a substantial or injurious effect on the jury's verdict in light of the strength of the other evidence. Perez's physical description was cumulative of that other testimony (not to mention his own in-person identification of the defendant at the station house). There is no showing that this testimony so impacted the trial as to render it trial fundamentally unfair. Therefore, this claim will be denied.

D.  Claim III -- Ineffective Assistance of Counsel

Mr. Page has raised a number of claims of ineffective assistance of counsel. The legal standard of review was well settled in *Strickland v. Washington*, 466 U.S. 668 (1984).

First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013). Petitioner must identify acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. The federal court must then determine whether in light of all of the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. *See id.*

Second, a petitioner must affirmatively show prejudice, which is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n. 11 (3d Cir. 2012). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey*

*v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

In assessing the state's resolution of an ineffective assistance claim under AEDPA, there

is an additional consideration:

> The pivotal question is whether the state court's application of the
> *Strickland* standard was unreasonable. This is different from
> asking whether defense counsel's performance fell below
> *Strickland*'s standard. Were that the inquiry, the analysis would be
> no different than if, for example, this Court were adjudicating a
> *Strickland* claim on direct review of a criminal conviction in a
> United States district court. Under AEDPA, though, it is a
> necessary premise that the two questions are different. For
> purposes of § 2254(d)(1), an *unreasonable* application of federal
> law is different from an *incorrect* application of federal law. A
> state court must be granted a deference and latitude that are not in
> operation when the case involves review under the *Strickland*
> standard itself.

*Harrington*, 131 S. Ct. at 785 (internal quotation marks and citation omitted) (emphasis in

original).

Mr. Page states that he is here incorporating all of the ineffective assistance of counsel

claims raised on direct appeal and in his PCR proceedings. On direct appeal, Mr. Page raised the

following ineffective assistance claims: (1) failure to request a pretrial *Wade* hearing; (2) failure

to request a *Clawans* charge with regard to the three victims who did not testify at trial; and (3)

requesting that petitioner sit elsewhere in the courtroom without having researched the legal

authority in advance. In his PCR proceedings, petitioner raised the following ineffective

assistance claims: (1) failure to subpoena McGowan, Newsome and Perez; (2) conducting poor-

cross-examination of witnesses; (3) failure to object to inadmissible hearsay and a suggestive

show-up identification; and (4) giving an inadequate summation. In his federal habeas petition,

Mr. Page raises two more ineffective assistance claims: (1) appellate counsel's failure to raise the prosecutorial misconduct issues on direct appeal; and (2) appellate counsel's failure to raise the issue of victim Africa Martin Barbour's getting on the witness stand holding her infant child. Mr. Page also asserts that the cumulative effect of all of these errors deprived him of a fair trial. Each of these claims is considered in turn.

     i.    *Failure to request a Wade hearing*

Page contends that trial counsel was ineffective for failing to request a pretrial *Wade*[7] hearing to challenge the witnesses' out-of-court identifications of him. The last reasoned decision on this claim was that of the Appellate Division on direct appeal:

> Defendant asserts that the identification of defendant amounted to a "show-up." The first four victims were seated together in a waiting area in the precinct, were indirectly advised by police officers that one of the armed robbers had been caught, and they shortly thereafter at a second precinct identified defendant as he was being brought in for processing in handcuffs.
>
> Defendant must establish two elements to show that he was provided ineffective assistance of counsel. First, defendant must show, by identifying acts or omissions that his trial counsel failed to fulfill the counsel guarantee of the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 90 L. Ed. 2d 674, 693 91984); *State v. Fritz*, 105 N.J. 42, 52 (1987). Second, defendant must establish that his counsel's performance was so deficient as to create a reasonable probability that these deficiencies materially contributed to his conviction. *See Frtiz, supra*, 105 N.J. at 58.
>
> On August 23, 2004, at the Plea Cutoff Hearing, defense counsel made the following statement to the trial judge when the judge inquired concerning the notation of a *Wade* hearing on a prior plea cutoff form.
>
>> I've already had discussions with [defendant] both at the County, again at the courthouse concerning whether or not I would actually conduct a Wade Hearing. I don't think in this case I would.

---

[7] *United States v. Wade*, 388 U.S. 218 (1967).

> Strategically, I would rather cross-examine the witnesses fresh, not give them a trial run at a Wade Hearing, but rather address these issues during the trial in front of the jury.
>
> [Defendant] will let me know for certain because I indicated to him after I explained to him why I would not do a Wade Hearing, if he still wanted a Wade Hearing, I will do one right before trial.
>
> . . . .
>
> Frankly, at this juncture, even if I did see an issue of a taint, in a case like this, I have explained to [defendant], I would rather a jury hear that fresh from a witnesses because a jury pick up –
>
> THE COURT:  for strategic reasons even if you did find –
>
> [DEFENSE ATTORNEY}:  Yes.

Upon conducting a *Wade* hearing, the trial court engages in a two-step analysis. *State v. Madison*, 109 N.J. 223, 232 (1988). The court must first determine whether the identification procedure was impermissibly suggestive. *Ibid.* If the court makes this determination, it must then decide whether the identification procedure was nonetheless reliable. *Ibid.* The reliability determination is to be made from the totality of the circumstances in a particular case. *Id.* at 239; *Manson v. Braithwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1970). Factors the court should consider in determining reliability are:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
>
> [*Manson, supra*, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154.]

"If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence." *Madison, supra*, 109 N.J. at 232.

In *State v. Herrara*, 187 N.J. 493 (2006), the Supreme Court affirmed the allowability of show-up identifications in

circumstances where the identification was as suggestive as the identifications here. In *Herrera*, defendant's convictions for carjacking and receiving stolen property resulted from the assault of a private security guard and the theft of his motor vehicle as the guard was leaving a Hoboken housing complex after completing his shift. The defendant was involved in an accident nearby with the victim's car and was arrested for intoxication. After the police learned the vehicle involved in the accident was owned by the security guard, the police took the security guard to the emergency room (ER) of the hospital where the defendant was taken. The police told him to identify the person. The victim identified the defendant, who was sitting on a hospital bed about six feet away. The only other persons in the ER were two police officers and nurses. *Id.* at 497-505.

The defendant argued that the statements made by the police to the victim made the show-up procedure impermissibly suggestive. *Id.* at 498. Further, he asserted that the show-up procedure lacked trustworthiness because the description defendant provided of the defendant was inaccurate and because a significant period of time elapsed from the time of the incident to the time of the show-up identification.

The Court reiterated its adherence to federal constitutional precedents in deciding the admissibility of show-up identification procedures. *Id.* at 499-501. The Court noted that the constitutionality of a show-up identification is determined by examining the totality of the circumstances. *Id.* at 502. Further, the Court clarified that the test was "whether under the totality of the circumstances the identification was reliable enough though the confrontation procedure was suggestive." *Id.* at 503 (quoting *Neil v. Biggers*, 409 U.S. 188, 194, 93 S. Ct. 375, 380, 34 L. Ed. 2d 401, 408 (1972)). The Court further noted that "reliability is the linchpin in determining the admissibility of identification testimony." *Ibid.* (quoting *Manson*, *supra*, 432 U.S. at 99, 97 S. Ct. at 2245, 53 L. Ed. 2d at 144).

The Court determined that in combination with the suggestiveness inherent in a show-up, the added comments by the police rendered the out-of-court identification impermissibly suggestive because the police comments may have influenced the victim to develop a firmer resolve to identify someone he might otherwise have been uncertain was the culprit. *Id.* at 506.

However, the Court found that the impermissibly suggestive show-up procedure was nevertheless sufficiently reliable to warrant the

admissibility of the identification by the victim. The Court determined that the show-up, which took place slightly less than five hours after the offense, was within a reasonable time. The Court found the victim had sufficient opportunity to view the defendant when the defendant stopped the victim to ask for money before he assaulted him, coupled with the fact that he had observed the defendant previously in the area of the housing complex almost daily. Because the victim quickly identified the defendant in the ER, the Court determined there was a level of certainty demonstrated in the identification. The Court, after weighing the factors in favor of reliability against the corrupting effects of the impermissibly suggestive procedure, was satisfied that the identification procedure was reliable and did not result in a substantial likelihood of misidentification. *Id.* at 506-09.

[Officer] Kenny testified that [victims] Melvin and Perez were seated in the lobby speaking with him when defendant was brought in. The officer indicated that the two victims looked up, saw defendant, and immediately indicated that he was the man who had robbed them. Similarly, while in the precinct, Barbour observed that the police "just happened to bring [defendant] in." Barbour immediately identified defendant as the robber at that time. Further, defendant was brought into another room while Martin was giving a statement to Detective Frascino, at which time, Martin saw defendant and identified him as the robber. Martin testified:

> We got [to the police precinct], we gave our statements and like 15 minutes into giving the statements, they said they caught the guy. He was in the process, I guess, of robbing somebody else. They brought him in.
> . . . .
> They brought him in and walked him past us and we identified him. That was him.

On direct examination, Barbour testified:

> Q. Do you remember whether you stayed around to give like a formal statement where they type up and you signed it?
> A. [Yes].
> . . . .
> Q. And how long did that take?
> A. I was there for a minute, because in the process of all of that, they caught him.
> Q. And how long was it when you first saw him on Bayview to where you saw him?

. . . .

A. Not long at all.

[Emphasis added.]

Applying the rule of law from *Herrera* to the facts here, we conclude that the circumstances of the identification by Melvin and Perez, who were already in the precinct completing paperwork when they spontaneously identified defendant when he was brought in after his capture, was not impermissibly suggestive. We are convinced, however, that the transporting of the other four victims from one precinct to the waiting area of another precinct for purposes of identifying "the guy" was an impermissibly suggestive show-up.

Notwithstanding the impermissible suggestiveness of the show-up resulting in the identification by McGowan, Martin, Barbour and Newsome, we are convinced that their identifications of defendant were nonetheless reliable. The identifications took place within an hour of the commission of the robberies, each victim had a good view of the victim when he robbed them at gun point, each victim furnished a reasonably accurate description of the defendant to the police, including the gloves he was wearing, and the victims exhibited a high level of certainty in their identification of defendant the perpetrator. Additionally, they identified the items of their property, which had been taken from them, which was found in close proximity to defendant when he was apprehended. Melvin and Perez interrupted their conversation with Kenny when they looked up, recognized defendant, and identified defendant as the robber. Barbour immediately recognized defendant as the person who had robbed her, which was demonstrated by her spontaneous, panicked reaction upon seeing him at the precinct. Finally, the time between the crimes and the identification was very brief. Thus, defendant cannot show that even if trial counsel had requested a *Wade* hearing that the hearing would have been conducted, and if conducted, that the court would have excluded the out-of-court identifications.

Further, defendant cannot demonstrate that even if the out-of-court identifications were excluded, that he would have been acquitted of the charges against him. The State had overwhelming evidence against defendant, including the victims' positive identification of property taken during the robberies that was found in defendant's possession or in close proximity to him upon his apprehension, the victims' identification of the gun used during the robbery, and

> Kenny's observation of defendant at the second robbery scene and
> his identification of defendant at the precinct and in court.
>
> We are satisfied, therefore, that defendant cannot satisfy the
> *Strickland/Fritz* test to prove ineffective assistance of counsel on
> the basis that his attorney did not request a *Wade* hearing.
> Defendant cannot show that his counsel's performance in declining
> to request a *Wade* hearing as matter of trial strategy was deficient
> or that his counsel's performance prejudiced the defendant. *See
> State v. Savage*, 120 N.J. 594, 617 (1990).

(Dkt. No. 9-16 at p. 24-32.)

The denial of this claim was not an unreasonable application of the *Strickland* standard.

The Appellate Division properly stated the law and found that Mr. Page failed to satisfy either of

the *Strickland* prongs. Page failed to show that his counsel's decision to bypass a *Wade* hearing

fell below an objective standard of reasonableness. Indeed, there was no need to indulge the

*Strickland* presumption that defense counsel's actions implemented trial strategy—counsel said

so at the time. He explicitly waived a *Wade* hearing, stating that "strategically" he preferred to

cross-examine these witnesses at trial, without giving them a "trial run" in a pretrial hearing. The

Appellate Division could, and did, find that this was within the broad scope of permissible trial

strategies. Accordingly, Mr. Page fails to show that the Appellate Division's decision

unreasonably applied the first prong of *Strickland. See Pierce v. Dow*, No. 11-3965, 2013 WL

6027928, at *11 (D.N.J. Nov. 13, 2013) (finding that petitioner failed to demonstrate deficient

performance by counsel's decision not to request a *Wade* hearing as state courts concluded that

the decision constituted sound trial strategy).

Nor did the Appellate Division unreasonably apply the second, "prejudice" prong of

*Strickland.* Mr. Page failed to demonstrate that a *Wade* hearing would have resulted in the

exclusion of the out-of-court identifications. That was not an unreasonable application of clearly

established federal law. *Accord Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621

F.3d 196, 203-04 (2d Cir. 2010) (finding that state court did not unreasonably apply clearly established federal law in denying habeas relief on claim where witness spontaneously identified defendant at police station) (citations omitted); *Ross v. McCoy*, No. 00-804, 2001 WL 30451, at *2-3 (S.D.N.Y. Jan. 10, 2001) (denying § 2254 habeas claim where state court found that identification was not unduly suggestive as it was a spontaneous occurrence).

As the state court noted, the identifications by Melvin and Perez were spontaneous and reliable, not the product of impermissible suggestion. In so holding, the Appellate Division correctly laid out the applicable factors, including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrate at the confrontation and the time between the time and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *United States v. Anthony*, 458 F. App'x 215, 218 (3d Cir. 2012) (not precedential). The Appellate Division noted that the identifications took place within an hour of the commission of the robberies. *See Manson*, 432 U.S. at 131 ("[T]he reliability of an identification is increased only if it was made within several hours of the crime."). The victims furnished a reasonably accurate description of the perpetrator to the police and identified property which had been taken from them found on Mr. Page's person or in his vicinity. Mr. Page failed to establish that the state court's decision in this respect was an unreasonable application of clearly established federal law. *See, e.g., United States v. Nobles*, 322 F. App'x 96, 98 (3d Cir. 2009) (defendant failed to show that show-up identification was unreliable where witness saw defendant cross the street, saw his face in the restaurant, described defendant accurately to police and identification was certain and made shortly after the crime).

The Appellate Division did find that the McGowan, Martin, Barbour and Newsome identifications were unduly suggestive; it also found, however, that they were nevertheless reliable under all the circumstances. In doing so, it correctly stated and applied the two-step *Wade* analysis: (1) whether the identification process was unduly suggestive and, if so, (2) whether the totality of the circumstances nonetheless renders the identification reliable. *See United States v. Roland*, 545 F. App'x 108, 114 (3d Cir. 2013) (not precedential; setting forth steps that are necessary before suppressing identifications under *Wade*) (citing *Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir. 2005)). These identifications took place within an hour of the robberies, each victim had a good view of the robber and described him (and his gloves) accurately to the police, each showed a high degree of certainty, and they identified some of the stolen property found near the defendant. That was a reasonable application of federal law, which I cannot overturn.

Therefore, the claim will be denied.

ii.     *Failure to Request a* Clawans *Charge*

Mr. Page's next claim is that his trial counsel was ineffective when he failed to request that the jury be instructed in accordance with *State v. Clawans*, 38 N.J. 162, 183 A.2d 77 (1962), that it could infer that the three non-appearing victims would have testified adversely to the prosecution.

The last reasoned decision on this claim is that of the Appellate Division on direct appeal, excerpted here:

> Under *Clawans*, for the jury to be charged on the adverse inference permitted to be drawn from the non-production of a witness, it must appear that (1) the witness is within the power or control of one party, (2) the witness is practically and physically available to that party, (3) the witness' testimony will elucidate relevant and critical facts in issue, and (4) the witness' testimony would have

been superior to that already utilized. *State v. Hickman*, 204 N.J. Super. 409, 414 (App. Div. 1985).

The prosecutor indicated to the trial judge, near the end of its case, that the State had been having difficulty reaching the three victims. The prosecutor advised the judge that the three non-testifying victims, McGowen, Newsome and Perez, had been subpoenaed, but that the subpoenas went unreturned. The prosecutor told the judge that as a result, the State did not have these witnesses available for trial. The prosecutor indicated to the judge that he would like to wait until the next day, and if the witnesses did not appear for trial, then the State would be prepared to rest. At the prosecutor's request, the trial judge issued warrants for the non-appearing witnesses to testify at trial. On the following day, the witnesses did not appear and the State did rest.

We are satisfied that the fourth *Hickman* factor could not be shown because the non-testifying victims would have only provided cumulative and not "superior" testimony to that evidence already presented. *Id.* at 414. The victims were robbed in three sets of two, and one victim from each set testified. In addition, Officer Kenny, who witnesses defendant in the midst of robbing Melvin and Perez, gave an account of his observations at trial. Furthermore, Officer Donnelly and Detective Caldwell testified as to McGowan's and Perez's identification of their property taken during the robberies, which was recovered by the police within a few feet of where defendant was arrested.

Further, the prosecutor explained to the court that he had subpoenaed the missing victims and attempted to produce them at trial. The judge issued warrants requiring their appearance. Apparently they could not be located or were evading subpoenas. Thus, the second *Hickman* factor was also not able to be demonstrated.

We are satisfied that the factors necessary to warrant a *Clawans* charge were not satisfied here. Therefore, counsel could not have been deficient under the first prong of the *Strickland-Fritz* test. As for the second prong, defendant has failed to show how the outcome of the trial would have been different had a *Clawans* charge been requested.

(Dkt. No. 9-17 at p. 2-5.)

Mr. Page fails to show that trial counsel was ineffective for failing to request a *Clawans* charge (which, in any event, is a matter of State law).[8] As previously noted, an ineffective assistance of counsel claim requires a demonstration of deficient performance and prejudice, *i.e.,* a reasonable probability that had his counsel requested the *Clawans* charge, the outcome of the case would have been different.

The Appellate Division noted that failure to give a *Clawans* charge was not an error, even under state law.  One witness to each of the three robberies had testified, and the prosecutor had explained to the Court that it could not locate the missing three victims. *See State v. Hickman*, 499 A.2d 231, 234 (N.J. Sup. Ct. App. Div. 1985). And there is no showing of prejudice: as the Appellate Division pointed out, the charge, if requested, would not have been given. Accordingly, this claim does not merit federal habeas relief.

iii.    *Failure to Research Seating Petitioner Elsewhere During Trial*

On direct appeal, Mr. Page also argued that trial counsel was ineffective for failing to research whether he could sit elsewhere while the victims were testifying. His position at counsel table, he contends, too strongly suggested to these victim witnesses that he was the culprit. The ineffective assistance claim is confined to the "failure to research"; Mr. Page's counsel did in fact request that his client be permitted to sit elsewhere during the victims' testimony. The trial court rejected that request, addressing Page's counsel as follows:

> [S]how it to the court, where a defendant who says he wants to sit
> on the last row of the courtroom instead of the first row at Counsel

---

[8]    Federal habeas is not available to correct errors of state law. A habeas petitioner who substantively challenges state jury instructions must "point to a federal requirement that jury instructions ... must include particular provisions," or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him." *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir.1997). Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Recasting the claim as one of ineffective assistance does not alter the picture appreciably, except insofar as it tends to excuse the failure to raise it at trial.

> table, where that has come before a court, Supreme Court, an
> Appellate Division Court, that this Court would have to follow a
> ruling, that I would have to follow saying the Defendant has the
> Right in that Right to be present at trial and to present for all
> purposes at trial, that concomitantly with that Right, that he has the
> Right to choose where he sits in the courtroom. I want to see that.

(Dkt. No. 9-52 at p. 21-22.)  The Appellate Division denied this claim on direct appeal without discussion.

The state court's decision was not contrary to, or an unreasonable application of clearly established federal law. *See Cullen*, 131 S.Ct. at 1402 ("Section 2254(d) applies even where there has been a summary denial.").  And Mr. Page failed to show that the outcome of the proceeding would have been different had trial counsel done more research into the issue.

Mr. Page relies on *United States v. Thoreen*, 653 F.2d 1332 (9th Cir. 1981). There, in dicta, the United States Court of Appeals for the Ninth Circuit stated that if identification were at issue, an attorney could test a witness's credibility by obtaining the the court's permission to (1) seat two or more persons at counsel table without identifying the defendant; (2) have no one sit at counsel table, or (3) hold an in-court lineup. *See id.* at 1342 n.7.

Mr. Page has not demonstrated a reasonable probability that a New Jersey state trial court would have even followed that non-binding and isolated dictum, already 23 years old at the time of his trial. (Recall that the trial court challenged the defense to produce a binding ruling of the "Supreme Court, an Appellate Division Court, that this Court would have to follow.")  And, as he acknowledges, the Ninth Circuit at best suggested that a trial court possesses the *discretion* to grant such a request, not that it was *required* to do so. (*See* Dkt. No. 9-11 at p. 6.)  Finally, even if Page had been seated elsewhere, there is no showing of a reasonable probability that the trial would have turned out differently.

34

As previously discussed, there was a plethora of evidence against Mr. Page, including contemporaneous eyewitness identifications, one of them by a police officer, and physical evidence seized in proximity to Page. This ineffective assistance claim, too, will be denied.

iv.   *Ineffective Assistance of Counsel Claims Raised in PCR Proceedings*

Mr. Page also incorporates the ineffective assistance of counsel claims he made in his State PCR proceedings. As previously stated, Mr. Page argued there that trial counsel was ineffective because he:  (1) failed to subpoena McGowan, Newsome and Perez; (2) conducted a substandard cross-examination of witnesses; (3) failed to object to inadmissible hearsay as well as the suggestive show-up identification; and (4) gave an inadequate summation. The last reasoned decision on these claims was from the New Jersey Superior Court, Appellate Division, on appeal from the denial of PCR:

> Without establishing a prima facie case of ineffective assistance of counsel, there is no entitlement to a PCR evidentiary hearing. R. 3:22-10(a). *See also State v. Precise*, 129 N.J. 451, 462 (1992); *State v. Cummings*, 321 N.J. Super. 154, 169 (App. Div.), *certif. denied*, 162 N.J. 199 (1999).
>
> . . . .
>
> When the court applied the *Strickland v. Washington* test, it concluded that petitioner had not met his obligation to prove that the representation provided by his attorney fell below an objective standard of reasonableness." *Strickland, supra*, 466 U.S. at 688, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. The court considered the attorney's strategy not only reasonable given the overwhelming proofs, but that defendant utterly failed to establish "that his attorney was not well-prepared, thoroughly familiar with the record and persistently and forcefully advocating for his interests." In addition, as the court stated, defendant failed to prove that but for any decision made by his attorney, "the outcome of his case would have been different."  Relying on *State v. Fritz, supra*, 105 N.J. 42, the court noted that prejudice is not presumed but must be proven by the petitioner, and that defendant had not identified any prejudice flowing from his attorney's conduct. *Id.* at 52.
>
> . . . .

>Defendant also contends trial counsel's damaging cross-examination of witnesses, failure to conduct adequate pretrial investigation, and failure to present a meaningful defense constituted ineffective assistance. Defendant, however, does not suggest how a different trial strategy, a more thorough pretrial investigation or a better cross-examination could have yielded a more favorable outcome for defendant.
>
>It is also asserted that counsel, during summation, mistakenly referred to Perez, who failed to appear, as Melvin, the victim who did appear. Again, defendant does not explain how the mistaken reference prejudiced him.
>
>As the PCR judge noted, a defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. A reasonable probability is one which undermines confidence in the outcome of the trial. *Ibid.* Defendant must prove by a preponderance of the evidence that trial counsel's conduct fell outside the broad spectrum of competent legal representation. *See Fritz, supra*, 105 N.J. at 52. Defendant has failed to carry that burden.

(Dkt. No. 9-38 at p. 7, 8, 9-10.)

Counsel's failure to subpoena McGowan, Newsome and Perez to testify, Mr. Page argues, was harmful because they would have failed to identify him at trial. There is no evidence of that, however, beyond Page's say-so. More fundamentally, the state court cannot have unreasonably applied *Strickland* here. The prosecution not only attempted to subpoena these witnesses, but obtained arrest warrants for them. There is no reason to conclude that, if Mr. Page's trial counsel had added his own subpoena to those of the prosecution, the witnesses would have appeared. For these reasons, Mr. Page fails to show that he is entitled to federal habeas relief on this claim.

Mr. Page faults his attorney's cross-examination of police witnesses, arguing that counsel should have elicited that Page would have needed an automobile to commit the robberies. The

denial of this claim was not an unreasonable application of *Strickland*. Page cites *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989), in which the Court of Appeals held that defense counsel had been ineffective because he failed to impeach a witness with her prior testimony that another person had committed the murder. The application of *Nixon* to this case is strained, at best. Page makes no showing that the proffered testimony could have been elicited from these witnesses, that it had any factual basis whatever, or that it would have been significantly exculpatory. Further, in light of the strong identification and other evidence against Mr. Page, there is no reasonable possibility that this line of cross-examination would have led to a different result. This claim does not merit federal habeas relief.

Mr. Page also claimed in his PCR proceedings that counsel was ineffective for failing to object to inadmissible hearsay and suggestive show-up identifications at the police precinct. On direct appeal, the Appellate Division ruled that these errors, considered substantively, were harmless, and I agree. No different result is required when they are subjected to the *Strickland* prejudice test. This claim, too, will be denied.

Finally, Mr. Page faults trial counsel's summation because counsel mixed up the name of Melvin, who did testify, with that of Perez, who did not. That slip of the tongue does not give rise to a *Strickland* claim. Indeed, the trial court caught the error, and Page's trial counsel corrected himself in response. More generally, the trial judge gave this jury the customary instruction that they should be guided by their own recollection of the evidence, not the statements of counsel, and the jury is presumed to have followed that instruction. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Accordingly, this claim does not warrant federal habeas relief as the state court did not unreasonably apply *Strickland*.

v.     *Appellate Counsel's Failure to Object to Presence of Barbour's Child*

Mr. Page argues in his federal habeas petition that appellate counsel was ineffective for failing to raise on direct appeal the trial court's denial of a mistrial when Barbour, a victim witness, appeared in court with her young child. Respondent claims that this claim is barred because petitioner never raised it before the state courts. Despite that apparent lack of exhaustion, I will briefly analyze this claim. *See Lambert*, 134 F.3d at 514-15.

When the prosecutor called Barbour to testify, she arrived in court with a three-year-old child. Mr. Page's trial counsel moved for a mistrial based on the child's potential to elicit sympathy from the jury. The trial court found that the circumstances did not require a mistrial. When Barbour stated that there was no one to care for the child, the Court permitted her to testify, but instructed the jury as follows:

> THE COURT:  I am going to have Officer Runne swearing you in a moment. I want to give you an instruction that, as far as I understand, this particular witness came in with a child because she – that's all she could do. She didn't have, at this moment any other place to have the child. She had to bring the child to Court with her. [¶]  Though we do have a room downstairs for children in the Family Court on the second floor, you cannot leave the child down there unaccompanied. So that's the point. I do not want you to take any inferences whatsoever at all from the fact she brought the child into this Court. I don't want you to consider that. That should not be regarded by you. I want you merely to concentrate on the testimony of this witness as she gives that testimony to you.

(Dkt. No. 9-56 at p. 15-16.)

Petitioner is not entitled to federal habeas relief on this claim. He fails to show a reasonable probability that the outcome of his appeal would have been different had appellate counsel raised this issue. On appeal, the standard of review of this denial of a mistrial would have been abuse of discretion. *E.g., State v. Winter*, 96 N.J. 640, 647 (1984); *State v. DiRienzo*, 53 N.J. 360, 383 (1969). The trial court, faced with a practical dilemma, did not simply ignore

the problem; rather, the trial judge made a judgment call that a a cautionary instruction would suffice to blunt any prejudice, and that a mistrial was not necessary. The court instructed the jury that it was not to make any improper use of the Barbour child's presence, and the jury is presumed to have followed that instruction. *See Weeks*, 528 U.S. at 234. Habeas does not empower a federal court, whether or not it would have responded in the same manner, to review such a discretionary determination.

Finally, for the reasons previously stated, the case against Mr. Page was strong. He does not show that, even if appellate counsel had pressed this argument, the Appellate Division would have found that the trial court's exercise of discretion tainted the verdict.

Accordingly, even assuming that he could overcome the exhaustion threshold, Mr. Page would not be entitled to federal habeas relief on this claim.

vi.    *Cumulative Effect of Ineffective Assistance of Counsel*

Mr. Page also argues in his federal habeas petition that the cumulative effect of all of his ineffective assistance of counsel claims merits granting federal habeas relief.[9] Errors that do not individually warrant federal habeas relief may sometimes do so when combined. *See Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002)) (footnote omitted). In this case, Mr. Page fails to demonstrate a reasonable probability that the outcome of his proceedings would have been different. As explained above, some of his claims do not involve deficient performance at all. Additionally, in light of the strong independent evidence in the case, there is no substantial or colorable showing that the outcome

---

[9] I note that Mr. Page raised a cumulative error argument in his PCR proceedings with respect to his ineffective assistance of counsel claims raised in those proceedings. However, as Mr. Page raises other ineffective assistance of counsel claims in this federal habeas petition, I have included all of his ineffective assistance of counsel arguments in analyzing this claim.

would have been different but for counsel's alleged errors, or that the State courts misapplied *Strickland.* The cumulative ineffective assistance of counsel claim is denied.

### E.  Claim IV – Sentencing Issues

Mr. Page states in his final claim that he was erroneously sentenced under New Jersey's "three strikes" law. He claims that his status as a repeat offender, found by the trial judge, should have been alleged in the indictment and submitted to the jury. Additionally, he claims that one of his prior convictions was successfully appealed, and therefore should not have been used to increase the statutory maximum sentence in this case.

Petitioner raised these issues in his *pro se* brief on direct appeal.  The Appellate Division denied this claim without discussion. I review the record to determine whether the state court's decision was contrary to, or an unreasonable application of clearly established federal law. *See Cullen*, 131 S. Ct. at 1402.

Mr. Page's argument that his repeat-offender status was an issue for the jury rests on the Sixth Amendment as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004). In *Apprendi*, 530 U.S. at 490, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  In *Blakely*, the Supreme Court further defined the "statutory maximum" that could not be increased without jury findings: "[T]he relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings."  542 U.S. at 302 (internal quotation marks omitted).

Under N.J. STAT. ANN. § 2C:43-7(a)(2), certain designated offenses may be punishable by an "extended sentence" of imprisonment for twenty years to life. (*See* Dkt. No. 9-17 at p. 8.)

Here, the prosecutor put the trial court and Mr. Page on notice that he was seeking such an extended term of imprisonment based on two of Page's prior convictions, pursuant to N.J. STAT. ANN. 2C:43-7.1(b). (*See* Dkt. No. 9-6.)  To that notice, the prosecutor attached two prior judgments of conviction for robbery and armed robbery, the later of which occurred within ten years before the current offense. Mr. Page's trial counsel responded to the prosecutor's notice that he was aware of Mr. Page's exposure to a mandatory extended term. (*See* Dkt. No. 9-7.)  At sentencing, the trial court took notice that Mr. Page met the criteria for an extended term, granted the prosecutor's "three strikes" motion, and found that the applicable statutory sentencing range was twenty years to life. (*See* Dkt. No. 9-66 at p. 13.)

A court may, consistent with *Apprendi,* take notice of prior convictions at sentencing. What *Apprendi* specifically reserves for jury consideration is a fact "*other than* the fact of a prior conviction." *See Apprendi*, 530 U.S. at 490 (emphasis added). Based on Page's prior convictions, the trial court found that the statutory extended sentencing range was twenty years to life. The trial court imposed a sentence of fifty years' imprisonment, within that statutory range. (Dkt. No. 9-8.)  *See Perez v. Glover*, No. 10-0655, 2012 WL 481122, at *23-24 (D.N.J. Feb. 14, 2012) (denying *Apprendi* habeas claim as to extended sentence based on prior convictions under New Jersey statute). That was permissible under *Apprendi.*

Relatedly, because the prior convictions did not have to be determined by a jury, they did not have to be alleged in the indictment. "[T]he Supreme Court [has] held that the existence of prior convictions that increase the statutory maximum sentence may be determined by the District Court at sentencing and need not be included in the indictment or established as an element of the offense." *United States v. Vazquez*, 381 F. App'x 168, 174 (3d Cir. 2010) (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998)).

Finally, Mr. Page argues that his extended sentence is invalid because he successfully appealed the 1998 conviction, one of the two on which the trial court based the extended sentence. That is literally true, but inconsequential. Mr. Page was convicted of first-degree robbery in 1998, and he appealed. On November 18, 1999, the Appellate Division remanded the matter for resentencing based on a downgrade from first degree to second degree robbery. *See* N.J. Stat. Ann. 2C:15-1. On remand, Page was resentenced on May 25, 2000, and a new judgment was entered.[10] (*See* Dkt. No. 9-6 at pp. 5-7.) It was based upon that *new* judgment (not the first, vacated judgment) that the prosecution sought, and the court imposed, an extended sentence. *See* N.J. Stat. Ann. 2C:43-7.1(b)(1).

For the foregoing reasons, Mr. Page is not entitled to federal habeas relief on any of his sentencing claims.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, the Court finds that a certificate of appealability shall not issue in this case.

---

[10] Indeed, it appears as if Mr. Page was resentenced on that first-degree robbery conviction by the Superior Court on May 25, 2000. (*See* Dkt. No. 9-6 at p. 5-7.)

## VI.    CONCLUSION

For the foregoing reasons, the habeas petition will be denied and a certificate of appealability shall not issue. An appropriate order will be entered.

DATED: May 14, 2014

KEVIN MCNULTY
United States District Judge